IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

Lynn Camisa,                          )
                                      )
        Plaintiff,                    )
                                      )   CAUSE NO:  2:12-cv-287
        vs.                           )
                                      )
Carolyn Colvin[1] , Commissioner of   )
Social Security,                      )
                                      )
        Defendant.                    )


OPINION AND ORDER

        This matter is before the court on the petition for review of the decision of the

Commissioner of Social Security filed by the claimant, Lynn Camisa, on July 25, 2012.  For the

following reasons, the decision of the Commissioner is **REMANDED.**

Background

        The plaintiff, Lynn Camisa, filed an application for Disability Insurance Benefits on

March 24, 2009.  (Tr. 12)  Her claim initially was denied on August 24, 2009, and again upon

reconsideration on December 8, 2009. (Tr. 12)  Camisa appeared and testified at a video hearing

held on March 4, 2011 before Administrative Law Judge ("ALJ") Kimberly S. Nagle. (Tr. 12)

On March 22, 2011, the ALJ issued a decision denying Camisa's disability claim. (Tr. 12-27)

Camisa requested review by the Appeals Council, which was denied on June 4, 2012. (Tr. 1-6)

Camisa filed her petition for judicial review on July 25, 2012.

_____

        [1]On February 14, 2013, Carolyn W. Colvin became the Acting Commissioner of Social
Security.  Pursuant to Federal Rule of Civil Procedure 25(d), Carolyn W. Colvin is automatically
substituted for Michael J. Astrue as the named Defendant.

1

Camisa was reported to have Asperger's syndrome, borderline intellectual functioning, and hypotonia. (Tr. 15) She underwent a psychological evaluation for vocational rehabilitation services in October 2006, which found her full scale IQ to be an 80. (Tr. 265-266) Camisa's reading was at the fourth grade level, spelling was less than a third grade level, and math was at a third grade level. (Tr. 267) The psychologist who performed the exam stated that Camisa suffered from a learning disability which affected all academic areas, and he diagnosed her with learning disorder NOS. (Tr. 267)

Camisa underwent another psychological examination in October 2007 with Dr. Warren Ugent to determine whether she was independent since her father recently had filed for emancipation in order to discontinue child support. (Tr. 272) On testing, Camisa displayed a significant interest in creating a positive impression and in downplaying the presence of any psychopathology. (Tr. 275) The report noted that Camisa continued to have problems in areas of hygiene, judgment, and socialization and that she did not independently engage in basic self-care like grocery shopping, meal preparation, and checkbook balancing. (Tr. 272) Camisa did not have any friends and frequently wore her hood up with earphones as a way to avoid others. (Tr. 272) She had difficulty concentrating and multi-tasking, anxiety, excessive worry and fears, excessive sleeping, crying, and social withdrawal. (Tr. 272-273) When Camisa was observed in the waiting room, she tended to avoid eye contact and lacked social pleasantries. (Tr. 273) Dr. Ugent reported that on examination Camisa's verbalization appeared concrete, she had difficulty expressing her ideas, and she tended to react and work slowly. (Tr. 273) Camisa's full scale IQ was a 79, her visual motor skills were at a late 7 year old level, communication skills at age 8.5, daily living skills at age 7.3, socialization skills at age 3.2, reading skills at a seventh grade level,

and spelling and math skills at a third grade level. (Tr. 273-275)

Dr. Ugent noted that Camisa would have significant difficultly functioning independently and had an abnormally low level of activity and energy. (Tr. 275-276) The psychologist concluded that Camisa demonstrated characteristics of Asperger's disorder including impaired social interactions, lack of acknowledgment of others, decreased eye contact, bland facial expression, literal language interpretation, and repetitive and restrictive patterns of behavior and interest. Dr. Ugent diagnosed borderline intellectual ability, Asperger's disorder, generalized anxiety disorder, learning disability, and significant deficits in adaptive skill functioning. (Tr. 277)

Camisa had a follow-up visit with Dr. Ugent in September 2008, and he reported that Camisa did not smile or show emotion on meeting him. (Tr. 308) Camisa still was working as a dog washer and was not ready to be a groomer because there was too much stress involved and it took more patience to give a haircut. (Tr. 308) She was too tired to study, had no good friends, obsessively used her iPod, and would go days without taking a shower or brushing her teeth. (Tr. 308-309, 311)

In July 2009, Camisa had a psychological consultative examination as requested by the Social Security Administration, and the psychologist diagnosed Camisa with a history of Asperber's disorder. (Tr. 404-406) A Disability Determination Services reviewing psychologist reviewed the relevant evidence in July 2009 and concluded that Camisa was limited moderately in activities of daily living and social functioning and mildly limited in concentration, persistence, or pace. (Tr. 423) The doctor further determined that Camisa was limited markedly in the ability to follow detailed instructions and interact appropriately with the general public,

and moderately limited in the ability to sustain an ordinary routine without special supervision, to complete a normal workday and workweek without interruptions from psychologically based symptoms, to perform at a consistent pace without an unreasonable number and length of rest periods, to maintain socially appropriate behavior, to adhere to basic standards of neatness and cleanliness, to travel in unfamiliar places, to use public transportation, to set realistic goals, and to make plans independent of others. (Tr. 427-428) The doctor concluded that Camisa could follow simple instructions and do simple tasks, could not work with the general public or in jobs requiring intensive interpersonal contact with others, would work best alone in semi-isolation from others or as part of a small group, her pace probably would be somewhat slower than typical, she should be able to attend for two hour periods, and she could relate to coworkers and supervisors on a superficial basis. (Tr. 429)

At a February 2011 physical therapy evaluation the therapist reported that Camisa presented with a disinterested, flat affect, and was concrete in her interactions. (Tr. 442) Camisa had reduced strength in her legs of 4/5 on the right and 4+/5 on the left, but no further physical therapy was recommended at that time. (Tr. 442-443) Camisa also had some testing done in February 2011, including a sleep study for daytime sleepiness which was normal, and an EMG for numbness in feet and clumsiness which revealed polyneuropathy primarily involving sensory fibers. (Tr. 445, 449)

Camisa's supervisor at Pet Smart completed an evaluation for vocational rehabilitation after she was employed 30 days. (Tr. 270) The supervisor stated that Camisa was trying her best but having difficulty keeping up with the pace of the job and that they were trying to coach her on the areas she needed to improve on. (Tr. 270) After 60 days, the supervisor indicated that

although Camisa had excellent attendance and punctuality, she was below average in the areas of work rate, work quality, working independently, following directions, judgment and problem solving skills, and being courteous to customers. (Tr. 269) The supervisor wrote that Camisa was not picking up on the job duties like the supervisor had hoped and that there was not much improvement in her attitude when talking to customers despite the supervisor's numerous talks with her about the issue. (Tr. 269)

At the hearing before the ALJ, Camisa, her mother, Jill McNamara, and vocational expert Randall Harding testified. Camisa testified that she was in special education classes in high school. (Tr. 43) She lived with her mother and stepfather, and they drove her to and from work because she did not have a driver's license. (Tr. 43, 46) She was working part-time at Pet Smart for approximately 20 hours per week washing dogs. (Tr. 44) She was not able to work more hours because she got too exhausted working even 20 hours a week. (Tr. 44) She got the job through an agency that helped people with disabilities obtain employment, and she had a job coach. (Tr. 49) She only prepared meals at home that she could microwave. (Tr. 47) She also ran the dishwasher and did some vacuuming. (Tr. 47)

McNamara explained that Camisa had a lack of oxygen to her brain and almost died in childbirth. (Tr. 54, 55) She was in full-time special education classes in school, and when the school tried to mainstream her, it did not work out and she was put back in special education. (Tr. 58-59) She had urinated in her chair from the stress of being in regular education classes. (Tr. 59) Camisa had limitations with reading, math, and calculations, and sometimes she did not understand what people were saying. (Tr. 62) She had cerebral palsy and had to exert herself more than other people to do things, and her energy level wore out more quickly than others. (Tr.

55) Camisa also suffered from hypotonia which is low muscle tone throughout the body. (Tr. 55) Camisa did not have much strength in her hands and feet. (Tr. 56) She would drop things and had trouble gripping things, and she had to use bigger pencils throughout her schooling. (Tr. 56)

Although Camisa was good with animals, she was not good with people. (Tr. 57) She appeared to be disrespectful because she did not make eye contact and did not make appropriate expressions, such as smiling at certain things. (Tr. 57) She wore her hood up and had earphones in her ears frequently in order to block other people out. (Tr. 61) If Camisa was not able to work with animals at her job, she would not be able to deal with people on an ongoing basis. (Tr. 59) By working part-time, Camisa was extending herself as much as she was able to and appeared fatigued when coming home from work. (Tr. 59) She would go to her room and lay down or sleep after working a 4-hour shift. (Tr. 60) Camisa had problems with her right knee and lower back and had a tendency to fall. (Tr. 63, 64) Camisa was slow at completing tasks and did not always stay on task. (Tr. 66) She needed to be reminded several times about what specifically needed to be done. (Tr. 66)

The ALJ asked a hypothetical question of the vocational expert which included a person of Camisa's age, education, and past work experience who could perform light work with never climbing ladders, ropes, or scaffolds, occasionally climbing ramps or stairs, occasionally balancing, avoiding concentrated exposure to temperature extremes of cold and heat, humidity, and even moderate exposure to unprotected heights, could have no complex written or verbal communication, needed work that could be performed at a flexible pace with no fast-paced work, simple tasks and simple work-related decisions with few, if any, workplace changes, limited interaction with the public, ability to attend to tasks for a 2-hour period of time, ability to relate

on a superficial and ongoing basis with coworkers and supervisors, ability to attend to tasks for sufficient periods of time to complete them, ability to manage the stress involved in simple work, and reading at a 4th grade level, spelling at less than a 3rd grade level, and math at a 3rd grade level. (Tr. 73-75, 78) The vocational expert replied that the only job which would accommodate those limitations would be that of a light housekeeper, of which there were 700 jobs in the region of Gary, Indiana. (Tr. 78) The person would need to complete any assignments by the end of the day and complete rooms within a certain time limit at the housekeeper job. (Tr. 79) The job would not entail close supervision. (Tr. 79) The person would have to complete tasks including making beds, cleaning the bathroom, filling up buckets with water, and vacuuming. (Tr. 80) The person would need to be organized and have a certain pace and stay on track throughout the day in order to maintain the housekeeper job. (Tr. 80)

The ALJ issued her decision denying benefits on March 22, 2011. At step one of the five step sequential analysis used to determine whether an individual is disabled, the ALJ determined that Camisa had not engaged in substantial gainful activity since February 1, 2007, her alleged onset date. (Tr. 15) At step two, she determined that Camisa had the following severe impairments: Asperger's syndrome, borderline intellectual functioning, and hypotonia. (Tr. 15)

At step three, the ALJ found that Camisa's impairments did not meet or equal a listed impairment. (Tr. 15) In her discussion, the ALJ identified Listing 11.07 for cerebral palsy and Listing 12.02 for organic mental disorders. (Tr. 15-17) In her discussion of Listing 12.02, the ALJ found that Camisa had a mild restriction in activities of daily living. (Tr. 16) Camisa was able to prepare her own microwave meals, care for her pets, wash dishes, and dress herself. (Tr. 16) The ALJ acknowledged that Camisa needed help or encouragement to perform her daily

chores and that McNamara testified that she constantly reminded Camisa to dress appropriately, brush her teeth, use toilet paper, and bathe regularly.  (Tr. 16) Camisa indicated that she did not have any problem with personal care and her manager at Pet Smart reported that Camisa's personal appearance was excellent.  (Tr. 16)

The ALJ found that Camisa had moderate difficulties with social functioning.  (Tr. 16) The ALJ explained that McNamara testified that Camisa's Asperger's syndrome made it difficult for her to socialize with others, she wore a hooded sweatshirt and earphones to block out others, and she did not have any friends.  (Tr. 16) McNamara did indicate that Camisa spent time with co-workers and interacted with her immediate family members.  (Tr. 16) Camisa's manager noted that Camisa interacted well with co-workers.  (Tr. 16)

With regard to concentration, persistence, and pace, the ALJ found that Camisa had moderate difficulties.  (Tr. 16) Camisa's psychological consultative examination revealed that she gave up on activities that were too hard for her.  (Tr. 16) She also had an IQ score in the borderline to low-average range, but she was able to complete the nine-page function report in a responsive and coherent fashion.  (Tr. 16) Camisa reported that she could follow written directions fairly, pay bills, count change, handle a savings account, and use a checkbook.  (Tr. 16) McNamara stated that Camisa played video games and could count change.  (Tr. 16) The ALJ then noted that Camisa never had displayed an episode of decompensation and did not satisfy the Paragraph B criteria of Listing 12.02.

The ALJ next assessed Camissa's residual functional capacity as follows:

light work as defined in 20 CFR 404.1567(b) except the claimant can never climb ladders, ropes or scaffolds and can only occasionally climb ramps and stairs.  The claimant can balance occasionally, and must avoid concentrated exposure to temperature extremes and concentrated exposure to humidity.  Additionally, the

claimant must avoid even moderate exposure to unprotected heights. The claimant has the mental capacity to perform work that is limited to simple tasks performed in a work environment free of fast-paced production requirements. The claimant can perform work that involves only simple, work related decision; and with few if any, work place changes and limited interaction with the public. (Tr. 18)

In support of her RFC determination, the ALJ first summarized Camisa's testimony, noting that Camisa worked part-time as a dog washer and was worn out easily. (Tr. 18) She said that she worked four or five days a week, that she could work an eight-hour day, and that the longest shift she had ever done was a split-shift where she worked for five hours, took a two hour break, and then worked four additional hours. (Tr. 18)

The ALJ next summarized McNamara's testimony. (Tr. 19) NcNamara testified that Camisa was in special education classes throughout her schooling, that she was fatigued after she came home from her part-time job, and that Camisa's main problem was interacting with others. (Tr. 19) It was McNamara's opinion that Camisa's inability to do calculations and to communication with people limited her ability to work. (Tr. 19) She further testified that Camisa worked slowly and needed reminders to stay on task but that she could perform routine tasks, like washing dogs, without difficulty. (Tr. 19)

The ALJ next summarized a work performance evaluation form prepared by Camisa's manager at Pet Smart. (Tr. 19) She noted that Camisa's attendance, personal appearance, and punctuality were excellent, but that her work rate, work quality, and problem solving skills were below average. (Tr. 19) It was reported that Camisa was excellent in taking initiative, accepting responsibility, and accepting criticism from supervisors. (Tr. 19) She had an average ability to adjust to changes in routine and work independently. (Tr. 19) Camisa's manager completed another evaluation a month later and reported that Camisa was not picking up on her job duties

as she had hoped.  (Tr. 19) She rated Camisa below average in her work quality and rate, ability to work independently, ability to follow directions, judgment, and courteousness to customers. (Tr. 19) She also noted that Camisa's personal appearance was good and that she interacted well with co-workers.  (Tr. 19)

The ALJ next explained that she found "the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however the claimants statements concerning the intensity, persistence and limiting effects of these symptoms [were] not credible to the extent they [were] inconsistent with the above residual functional capacity assessment."  (Tr. 19)

The ALJ went on to explain Camisa's physical ailments, including hypotonia, lumbar pain, knee pain, daytime sleepiness, and dizziness.  (Tr. 20-21)   Camisa underwent a polysomnogram test for her complaints of daytime sleepiness.  (Tr. 21) The sleep latency study produced normal results.  (Tr. 21)

The ALJ then discussed Camisa's mental impairments.  (Tr. 21) She began by explaining that Camisa had a long history of special education classes and IQ scores that supported the diagnosis of borderline intellectual functioning.  (Tr. 21) On October 20, 2006, Dr. Raymond Bucur completed a psychological evaluation of Camisa.  (Tr. 21) Dr. Bucur administered the Weschsler Adult Intelligence Scale-III test, and Camisa received a full-scale IQ score of 80, which placed her in the low-average range of intellectual functioning.  (Tr. 21) Dr. Bucur also administered the Wide Range Achievement Test, and Camisa's achievement levels were well below where Dr. Bucur expected based on Camisa's low-average intellectual functioning.  (Tr. 21) Dr. Bucur suspected that Camisa had a learning disability.  (Tr. 21) Dr. Ugent confirmed that

Camisa's intellectual functioning was in the borderline to low-average range. (Tr. 21-22) The ALJ stated that the RFC accounted for Camisa's cognitive impairment by limiting her to simple work that only required that she make simple work related decision. (Tr. 22)

The ALJ then explained that the record indicated that Camisa had some limitations resulting from Asperger's syndrome. (Tr. 22) Dr. Ugent's September 2008 notes indicated that Camisa was happy with her part-time job as a dog washer but that she was not ready to become a dog groomer. (Tr. 22) Camisa reported working five days a week for five to eight hours per day and also reported that she did chores at her mother's house. (Tr. 22) Dr. Ugent noted that Camisa seemed engrossed in her own pursuits, did not have much interest in other people, and had difficulty expressing her ideas. (Tr. 22) Dr. Ugent concluded that Camisa would have significant difficulty functioning independently, and his diagnostic impression was Asperger's syndrome, borderline intellectual functioning, generalized anxiety disorder, adjustment disorder, learning disability, and significant deficits in adaptive skill functioning. (Tr. 22)

On July 7, 2009, clinical psychologist, Dr. Patrick McKian, completed a consultative examination of Camisa. (Tr. 22) Dr. McKian found Camisa's thought process to be logical and coherent, her affect was full range, and her mood was euthymic. (Tr. 22) Camisa reported that she did not do much socially but that she did talk to her brothers occasionally. (Tr. 22) Camisa knew that Barack Obama was the President of the United States, thought that the sun rose in the west, knew how many days were in a year, and knew that there were fifty states in the United States. (Tr. 22) Camisa made errors when performing basic calculations and was unable to perform the serial-sevens testing. (Tr. 22) Dr. McKian's diagnostic impression was Aspergers disorder, a learning disability, and hypotonia. (Tr. 22) He opined that Camisa would be able to

work in a job that had low expectations but that she was unable to do many things in terms of independent living and life skills and had no peer relationships.  (Tr. 22)

On July 16, 2009, a state agency psychological consultant, Dr. Joseph Pressner, completed a mental residual functional capacity assessment of Camisa.  (Tr. 22) Dr. Pressner noted that Camisa was capable of understanding, remembering, and carrying out simple tasks, had marked limitations in her ability to understand, remember, and carry out detailed instructions, and had marked limitations in her ability to interact appropriately with the general public.  (Tr. 23) Dr. Pressner noted that Camisa had a moderate limitation in her ability to complete a normal workday or workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.  (Tr. 23)  Camisa also had moderate limitations in her ability to maintain a routine without special supervision, maintain socially appropriate behavior, adhere to basic standards of neatness and cleanliness, travel in unfamiliar places, use public transportation, and set realistic goals or plan independently of others.  (Tr. 23) Camisa had no significant limitations in her ability to accept instructions from supervisors, get along with coworkers, or understand and carry out very short and simple instructions.  (Tr. 23)

Dr. Pressner also completed a psychiatric review of Camisa's medical record.  (Tr. 23) Dr. Pressner concluded that Camisa had moderate restrictions in activities of daily living, moderate difficulty in maintaining social functioning, mild difficulty in maintaining concentration, persistence, or pace, and no episodes of decompensation.  (Tr. 23) State agency psychological consultant, Dr. William Shipley, affirmed Dr. Pressner's conclusions on December 4, 2009.  (Tr. 23) The ALJ explained that Camisa's RFC accounted for her Asperger's

syndrome by limiting her to work that was free of fast paced production quotas and involved only limited interaction with the public in addition to the limitations discussed regarding Camisa's borderline intellectual functioning.  (Tr. 23)

The ALJ next explained the weight she assigned to the medical opinions.  Of relevance, the ALJ noted that she gave some weight to the opinions of the state agency medical consultants Dr. Fernando Montoya and Dr. J. Sands.  (Tr. 24) They found that Camisa's hypotonia was not severe and that the medical records did not indicate that Camisa was seriously limited by her hypotonia.  (Tr. 24)  However, the ALJ found that the testimony of Camisa and her mother supported the finding that her hypotonia was a severe impairment and limited her to light work as a result.  (Tr. 24) Both indicated that Camisa became easily fatigued after work and experienced dizziness.  (Tr. 24) The ALJ limited her to light work with additional postural and environmental limitations as a result.  (Tr. 24)

The ALJ then explained that she gave the opinions of Dr. Pressner and Dr. Shipley some weight.  (Tr. 24) She found that the testimony and written statements of Camisa and her mother supported a finding that Camisa had moderate difficulty maintaining concentration, persistence, and pace.  (Tr. 24) Specifically, McNamara's testimony that Camisa needed reminders to perform household chores and to complete other tasks supported her finding that Camisa had moderate difficulty maintaining persistence or pace.  (Tr. 24) The ALJ found that Camisa's performance on the serial sevens during her consultative examination, her IQ scores, and the reports from her Pet Smart manager supported the finding that Camisa had moderate difficulty with concentration.  (Tr. 24) Her testimony and written statements also indicated that she only had mild limitations in her activities of daily living.  (Tr. 24)

The ALJ next explained that she found Camisa's statements mostly credible. (Tr. 24) The ALJ limited Camisa to light work on account of her allegations of fatigue. (Tr. 24)

The ALJ also found McNamara's testimony to be mostly credible, but she explained that the medical records did not support McNamara's allegations of disabling physical and mental limitations. (Tr. 24) McNamara testified that Camisa could not care for her personal hygiene needs, but the ALJ found that there was nothing in the record to support that allegation. (Tr. 25) Camisa's manager indicated that Camisa's personal appearance was not a problem and that Camisa did not report any problems maintaining her personal hygiene. (Tr. 25) The ALJ also explained that Camisa's work history did not support McNamara's allegations that Camisa needed reminders to perform basic tasks. (Tr. 25) Camisa had been employed as a dog washer for two and a half years. (Tr. 25) There was no evidence that her manager made special exceptions for Camisa at work or constantly reminded Camisa to do her job. (Tr. 25)

At step four, the ALJ determined that Camisa had no past relevant work, and at step five she found that Camisa could perform work as a housekeeper. (Tr. 25-26)

## Discussion

The standard for judicial review of an ALJ's finding that a claimant is not disabled within the meaning of the Social Security Act is limited to a determination of whether those findings are supported by substantial evidence. **42 U.S.C. § 405(g)** ("The findings of the Commissioner of Social Security, as to any fact, if supported by substantial evidence, shall be conclusive."); *Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012); *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005); *Lopez ex rel Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). Substantial evidence has been defined as "such relevant evidence as a reasonable mind might accept to

support such a conclusion." ***Richardson v. Perales***, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28

L. Ed.2d 852, (1972)(*quoting **Consolidated Edison Company v. NRLB***, 305 U.S. 197, 229, 59 S.

Ct. 206, 217, 83 L.Ed.2d 140 (1938)); *See also **Shideler v. Astrue,*** 688 F.3d 306, 310 (7th Cir.

2012)***; Jens v. Barnhart***, 347 F.3d 209, 212 (7th Cir. 2003); ***Sims v. Barnhart***, 309 F.3d 424, 428

(7th Cir. 2002).  An ALJ's decision must be affirmed if the findings are supported by substantial

evidence and if there have been no errors of law.  ***Roddy v. Astrue,*** 705 F.3d 631, 636 (7th Cir.

2013)***; Rice v. Barnhart***, 384 F.3d 363, 368-369 (7th Cir. 2004); ***Scott v. Barnhart***, 297 F.3d

589, 593 (7th Cir. 2002).  However, "the decision cannot stand if it lacks evidentiary support or

an adequate discussion of the issues."  ***Lopez***, 336 F.3d at 539.

Disability insurance benefits are available only to those individuals who can establish

"disability" under the terms of the Social Security Act.   The claimant must show that he is

unable

> to engage in any substantial gainful activity by reason of any medically
> determinable physical or mental impairment which can be expected to result in
> death or which has lasted or can be expected to last for a continuous period of not
> less than 12 months.

**42 U.S.C. § 423(d)(1)(A)**.

The Social Security regulations enumerate the five-step sequential evaluation to be followed

when determining whether a claimant has met the burden of establishing disability.  **20 C.F.R. §**

**404.1520.**  The ALJ first considers whether the claimant is presently employed or "engaged in

substantial gainful activity." **20 C.F.R. § 404.1520(b).**  If she is, the claimant is not disabled and

the evaluation process is over.  If she is not, the ALJ next addresses whether the claimant has a

severe impairment or combination of impairments which "significantly limits . . . physical or

mental ability to do basic work activities."  **20 C.F.R. § 404.1520(c).**  Third, the ALJ determines

whether that severe impairment meets any of the impairments listed in the regulations. **20 C.F.R. § 401, pt. 404, subpt. P, app. 1**. If it does, then the impairment is acknowledged by the Commissioner to be conclusively disabling. However, if the impairment does not so limit the claimant's remaining capabilities, the ALJ reviews the claimant's "residual functional capacity" (RFC) and the physical and mental demands of her past work. If, at this fourth step, the claimant can perform her past relevant work, she will be found not disabled. **20 C.F.R. § 404.1520(e).** However, if the claimant shows that her impairment is so severe that she is unable to engage in her past relevant work, then the burden of proof shifts to the Commissioner to establish that the claimant, in light of her age, education, job experience and functional capacity to work, is capable of performing other work and that such work exists in the national economy. **42 U.S.C. § 423(d)(2); 20 C.F.R. § 404.1520(f).**

Camisa first challenges the ALJ's credibility determination. This court will sustain the ALJ's credibility determination unless it is "patently wrong" and not supported by the record. *Schmidt v. Astrue*, 496 F.3d 833, 843 (7th Cir. 2007); *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006) ("Only if the trier of fact grounds his credibility finding in an observation or argument that is unreasonable or unsupported ... can the finding be reversed."). The ALJ's "unique position to observe a witness" entitles her opinion to great deference. *Nelson v. Apfel*, 131 F.3d 1228, 1237 (7th Cir. 1997); *Allord v. Barnhart*, 455 F.3d 818, 821 (7th Cir. 2006). However, if the ALJ does not make explicit findings and does not explain them "in a way that affords meaningful review," the ALJ's credibility determination is not entitled to deference. *Steele v. Barnhart*, 290 F.3d 936, 942 (7th Cir. 2002). Further, "when such determinations rest on objective factors or fundamental implausibilities rather than subjective considerations [such

as a claimant's demeanor], appellate courts have greater freedom to review the ALJ's decision." ***Clifford v. Apfel***, 227 F.3d 863, 872 (7th Cir. 2000).

The ALJ must determine a claimant's credibility only after considering all of the claimant's "symptoms, including pain, and the extent to which [the claimaint's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." **20 C.F.R. §404.1529(a);** ***Arnold v. Barnhart***, 473 F.3d 816, 823 (7th Cir. 2007)("subjective complaints need not be accepted insofar as they clash with other, objective medical evidence in the record."); ***Scheck v. Barnhart***, 357 F.3d 697, 703 (7th Cir. 2004). If the claimant's impairments reasonably could produce the symptoms of which the claimant is complaining, the ALJ must evaluate the intensity and persistence of the claimant's symptoms through consideration of the claimant's "medical history, the medical signs and laboratory findings, and statements from [the claimant, the claimant's] treating or examining physician or psychologist, or other persons about how [the claimant's] symptoms affect [the claimant]." **20 C.F.R. §404.1529**(c); ***Schmidt v. Barnhart***, 395 F.3d 737, 746-747 (7th Cir. 2005)("These regulations and cases, taken together, require an ALJ to articulate specific reasons for discounting a claimant's testimony as being less than credible, and preclude an ALJ from merely ignoring the testimony or relying solely on a conflict between the objective medical evidence and the claimant's testimony as a basis for a negative credibility finding.")

Although a claimant's complaints of pain cannot be totally unsupported by the medical evidence, the ALJ may not make a credibility determination "solely on the basis of objective medical evidence." SSR 96-7p, at *1. *See also* ***Indoranto v. Barnhart***, 374 F.3d 470, 474 (7th Cir. 2004); ***Carradine v. Barnhart***, 360 F.3d 751, 754 (7th Cir. 2004) ("If pain is disabling, the

fact that its source is purely psychological does not disentitle the applicant to benefits.").  Rather, if the

> [c]laimant indicates that pain is a significant factor of his or her alleged inability to work, the ALJ must obtain detailed descriptions of the claimant's daily activities by directing specific inquiries about the pain and its effects to the claimant.  She must investigate all avenues presented that relate to pain, including claimant's prior work record, information and observations by treating physicians, examining physicians, and third parties.  Factors that must be considered include the nature and intensity of the claimant's pain, precipitation and aggravating factors, dosage and effectiveness of any pain medications, other treatment for relief of pain, functional restrictions, and the claimant's daily activities.  (internal citations omitted).

> *Luna v. Shalala*, 22 F.3d 687, 691 (7th Cir. 1994); *see also Zurawski v. Halter*, 245 F.3d 881, 887-88 (7th Cir. 2001).

In addition, when the ALJ discounts the claimant's description of pain because it is inconsistent with the objective medical evidence, she must make more than "a single, conclusory statement . . . . The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight."  SSR 96-7p, at *2.  *See Zurawski*, 245 F.3d at 887; *Diaz v. Chater*, 55 F.3d 300, 307-08 (7th Cir. 1995) (finding that the ALJ must articulate, at some minimum level, his analysis of the evidence).  She must "build an accurate and logical bridge from the evidence to [his] conclusion."  *Zurawski*, 245 F.3d at 887 (*quoting Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000)).  When the evidence conflicts regarding the extent of the claimant's limitations, the ALJ may not simply rely on a physician's statement that a claimant may return to work without examining the evidence the ALJ is rejecting.  *See Zurawski*, 245 F.3d at 888 (*quoting Bauzo v. Bowen*, 803 F.2d 917, 923 (7th Cir. 1986)) ("Both the evidence favoring the claimant as well as the evidence favoring the claim's rejection must be

*examined*, since review of the substantiality of evidence takes into account whatever in the record fairly detracts from its weight.") (emphasis in original).

Camisa raises several challenges to the ALJ's credibility determination. First, she complains that the ALJ used improper boilerplate language and determined her RFC prior to assessing her credibility. This type of boilerplate language almost always is used in Social Security opinions. Although the Seventh Circuit has criticized the use of such boilerplates, their use is not reversible error if the ALJ further supports her decision with the record. ***Yost v. Astrue***, 342 Wis.2d 576, 819 N.W.2d 240, 2012 WL 2814347 (N.D.Ill. July 10, 2010) (citing ***Punzio v. Astrue***, 630 F.3d 704, 709 (7th Cir. 2011)). Here, the ALJ also relied on McNamara's testimony, the performance evaluation form completed by Camisa's supervisor, and the medical evidence of record in support of her decision to discount Camisa's testimony. Although Camisa challenges the ALJ's reliance on some of this evidence, this will be addressed in turn.

Camisa complains that although the ALJ stated that she found Camisa's testimony to be credible, she disregarded some of her testimony without explanation. Specifically, Camisa argues that she testified that she was unable to work more than part-time because she became worn out too easily. Camisa pointed to medical evidence and McNamara's testimony as support of her complaints of fatigue that would restrict her from working more than part-time.

It is not clear that the ALJ's conclusion that Camisa could work on a full-time basis is inconsistent with her testimony. Camisa testified that she never had tried to work an eight hour day and that if she had to wash more than seven to ten dogs on a five to seven hour shift she could not handle it and somebody else would need to take over. (Tr. 44, 46) However, she later agreed that she could get through an eight hour shift. (Tr. 52) Because Camisa testified that the

amount of work she did during her shift affected her fatigue and that she could get through an 8 hour day, it was reasonable for the ALJ to conclude that a limitation to light work would accommodate for her fatigue.  At no point did Camisa state that she could not get through an eight hour work day at a light level, rather her testimony suggests just the opposite.  Because Camisa's testimony does not conflict with the ALJ's conclusion, it was not necessary for the ALJ to provide further explanation.

Camisa also complains that the ALJ similarly provided an inconsistent credibility determination with respect to McNamara's testimony, relying on it for some points and not others without explanation.  McNamara testified that Camisa could not care for her personal hygiene needs and would go days without showering or brushing her teeth.  The Commissioner did not address this argument in her response brief.  However, in her opinion the ALJ explained that although there was evidence that Camisa needed reminders to care for her personal hygiene, there was nothing to show that she could not maintain her hygiene.  Camisa testified that she was able to do so, and her manager reported that Camisa's appearance was not a problem.  The ALJ went on to explain that Camisa was able to work as a dog washer for two and a half years and that there was no evidence that her manager made special exceptions for her at work or constantly reminded her to do her job as a dog washer.  For this reason, the ALJ discredited McNamara's testimony that Camisa needed constant reminders.  The court will not overturn an ALJ's credibility finding unless it is patently wrong, and here the ALJ's explanation was well-reasoned, explained, and supported by evidence.

Camisa also criticizes the ALJ's reliance on her manager's evaluation, arguing that it did not support the ALJ's conclusion that Camisa did not need constant reminders because she

always did work on a part-time basis, she obtained the job through an agency that helped people with disabilities, and her overall 60-day evaluation was below average in the areas of work rate, work quality, working independently, following direction, using judgment and problem solving skills, and being courteous to customers. Camisa's argument is misplaced. The ALJ did not rely on her employment to show that Camisa was capable of performing any of the above cited activities. Rather, she relied on the evaluation to show that there was a conflict between McNamara's testimony and Camisa's manager's review on the single task of performing work without constant reminders. This is not the type of patent ambiguity that demands remand.

Camisa's final challenge to the ALJ's credibility determination concerns the ALJ's disregard of McNamara's testimony that Camisa had difficulty interacting with others. Camisa argues that the ALJ acknowledged McNamara's testimony that she struggled to interact with others but did not explain if she accepted it. Camisa points specifically to McNamara's statment that Camisa could get along well with animals, but not people, and that she wore her hood up and earphones in her ears frequently in order to block other people out. Camisa argues that if the ALJ considered this testimony, it could have lead to greater social functioning restrictions than limited interactions with the public.

The record reflects that the ALJ considered and gave weight to McNamara's testimony. The ALJ acknowledged that McNamara believed Camisa's main problem was interacting with others and specifically referred to the above referenced testimony. (Tr. 16 & 19) McNamara did not testify about Camisa's ability to interact with co-workers and managers specifically. Rather, as the ALJ explained, Camisa's ability to interact with co-workers was more accurately explained in her manager's report. For this reason, the court does not find that the ALJ's

decision concerning Camisa's ability to interact with co-workers was in conflict with McNamara's testimony and required greater explanation.

However, this is not to say that the ALJ thoroughly explained her decision to give less weight to McNamara's opinion when considering Camisa's ability to interact with the general public. McNamara may not have been able to shed light on how Camisa interacted with co-workers, but she did testify about Camisa's general ability to interact with non-family members. McNamara's testimony on this point also was consistent with Camisa's manager's review, which indicated that Camisa did not interact well with customers. The ALJ provided no explanation for how she determined that Camisa was capable of having limited interaction, rather than no interaction, with the general public. Rather, as will be explained more thoroughly below, the evidence appears to show unequivocally that Camisa should not have any interaction with the general public. The ALJ must provide further explanation of her reasons for rejecting McNamara's testimony as it related to Camisa's ability to interact with the general public on remand.

Camisa also argues that the ALJ's RFC determination is insufficient as a matter of law. Camisa first refers the court to Dr. Pressner's opinion that she could not work with the general public, yet the ALJ found that Camisa could have limited interaction with the public without explanation. The Commissioner responded that Dr. Pressner's opinion elaborated that Camisa could not work with the general public only "in jobs which require intensive, interpersonal contact with others". (Tr. 429) Dr. Pressner's opinion more accurately states that "the claimant could not work with the general public or in jobs which require intensive, interpersonal contact with others." (Tr. 429) The ALJ has provided no explanation for why she deviated from this

opinion, nor has she pointed to any other medical evidence to support such a deviation.  In fact, the ALJ has provided absolutely no explanation for the basis of her conclusion that Camisa could have limited interaction with the public.  There appears to be no medical opinion of record advising that Camisa is capable of such contact, and without explanation, the court cannot discern how the ALJ reached this conclusion. The ALJ must resolve this discrepancy on remand.

Camisa further argues that the ALJ did not discuss Dr. Pressner's opinions that she had only a moderate ability to maintain socially acceptable behavior and to adhere to basic standards of cleanliness or that Camisa had a moderately limited ability to sustain an ordinary routine without supervision.  The Commissioner challenges this, arguing that Dr. Pressner later opined that Camisa was capable of making a schedule and could attend to tasks for sufficient periods of time to complete them.  Even if the ALJ found this to be an internal inconsistency and a reason to disregard Dr. Pressner's opinion that Camisa had a moderate ability to sustain an ordinary routine without supervision, the ALJ did not explain this in her opinion.  Again, the only medical opinion on this topic appears to be that of Dr. Pressner.  Absent explanation, the court cannot be sure why the ALJ deviated from this opinion or that the ALJ considered this conflict in Dr. Pressner's report.  Therefore, the court cannot conclude that the ALJ's decision was based upon substantial evidence.  This poses a particular problem because the job the VE identified, housekeeper, requires the individual to sustain an ordinary routine without supervision.

Based on the foregoing, the decision of the Commissioner is **REMANDED** for further consideration consistent with this Opinion.

ENTERED this 21st day of August, 2013

/s/ Andrew P. Rodovich
United States Magistrate Judge